750 S.E.2d 623

**The STATE, Respondent,**

v.

**James Lamarcus PAGE, Appellant.**

**Appellate Case No. 2012–208632.**

**No. 5182.**

Court of Appeals of South Carolina.

Heard Sept. 11, 2013.

Decided Nov. 6, 2013.

Breen Richard Stevens, of Orangeburg, and Appellate Defender Benjamin John Tripp, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Jennifer Ellis Roberts, both of Columbia, for Respondent.

GEATHERS, J.

This appeal follows the conviction of James Lamarcus Page (Appellant) for kidnapping, second degree criminal sexual conduct, second degree assault and battery, and possession of a knife during the commission of a violent crime. Appellant argues the trial court erred by (1) denying a motion to join his trial with that of his alleged accomplice, and (2) finding a witness's proffered testimony was not relevant and, as a result, not allowing Appellant to call that witness as part of his case-in-chief. Although the trial court did not err in denying joinder, the trial court did err in finding the witness's proffered testimony was not relevant and, in turn, not allowing Appellant to call that witness. Hence, we reverse and remand for retrial.

## FACTS

Victim 1 and Victim 2 (collectively Victims) alleged Appellant and Appellant's brother, Lentavis Baxter, sexually assaulted them within the apartment of Victim 1. Notably, the

Victims' version of events contrasts greatly with that of Appellant.

According to the Victims,[1] on the evening of September 22, 2010, they encountered Appellant and Baxter. Victim 1 alleged that after she returned to her apartment following a quick run to the store with Victim 2, she entered her apartment and left the front door ajar, as Victim 2 was retrieving a bag from the car. When Victim 2 entered the apartment, two males, one "large" and one "skinny," appeared from behind Victim 2 and followed her inside. When the dog of Victim 1 began barking, the "skinny" male yelled, "Get your dog, or I'm going to kill it." Victim 1 quickly placed the dog in a bedroom and turned on a television to keep the dog from continuing to bark.

After Victim 1 tended to the dog, the "skinny" male brandished a knife, took Victim 1 to the bathroom, faced her toward the mirror, choked her, and stated "this wasn't no f'ing joke." The "skinny" male repeatedly placed the knife near the throat of Victim 1 and then dragged Victim 1 out of the bathroom. As she was being dragged, Victim 1 could see the "large" male picking Victim 2 up by her neck; Victim 2 was no longer fully clothed—she wore only a shirt and underwear.

When Victim 2 began to fight back against the "large" male, the "skinny" male again placed his knife upon the throat of Victim 1 and ordered her to instruct Victim 2 to stop kicking. When Victim 2 continued to fight, the "skinny" male struck Victim 2 in the mouth, causing blood to "start pouring" out. Because the "bleeding was so bad," all four individuals proceeded to the bathroom to clean Victim 2's injuries; her nose and a cheekbone were broken, and her lip was split. The "large" male then removed Victim 2 back to the living room, and the "skinny" male forced Victim 1 into a small bedroom that lacked a bed. Upon entering the small bedroom, the "skinny" male instructed Victim 1 to prepare a bed on the floor. Although Victim 1 claimed she did not want to have sex with the "skinny" male, she told him that he did not have to hurt her because she "would do anything he wanted." While the knife sat alongside the makeshift bed, the "skinny" male

---

1. This depiction of the facts is based upon the collective testimony of the Victims.

engaged in sexual intercourse and oral sex with Victim 1. The "skinny" male also forced Victim 1 to smoke a presumably illicit drug. Throughout this encounter, Victim 1 could hear Victim 2 "hollering" from the other room.

When Victim 1 and the "skinny" man later emerged from the small bedroom, Victim 1 observed the "large" male engaged in sexual intercourse with Victim 2. The "large" male then demanded Victim 1 perform oral sex on him. Victim 1 responded, "No," turned back toward the "skinny" guy and pleaded, "don't make me, I want to be with you;" as Victim 1 would later explain, she "wanted" to be with the "skinny" male because the other was "so enormous," as the record suggests Appellant was overweight. Undeterred, the two males made Victim 1 and Victim 2 enter the small bedroom and further sexually assaulted them. This time, however, the two males switched Victims.

Early the next morning, Victim 1 resourcefully provided the "skinny" male with a drink for him to give to the other male. With both the "large" and "skinny" males distracted, Victim 1 sneaked over to the front door, disengaged the locks, and ran naked across the street to a neighbor's house. Victim 1 then used a phone at that location to dial 911, and the police arrived shortly thereafter. The "skinny" male was subsequently identified as Baxter and the "large" male as Appellant.

The following day, Appellant turned himself in; Baxter was arrested later. While in custody, Appellant acknowledged his *Miranda* rights, waived them, indicated that he could read and write, and provided his version of the encounter through a signed statement.

Appellant's version of events stands in stark contrast to that of Victims 1 and 2. According to Appellant's signed statement, he and Baxter were driving to a relative's apartment. Outside of the entrance to the apartment complex, two females motioned for them to stop. The females indicated they had recently been partying with two other men, smoking crack cocaine, and ingesting other drugs. The females asked Baxter if he had any crack, and Baxter replied he would provide some. In response, the females indicated their intent to make a quick run to the store before meeting Appellant and Baxter back at a nearby apartment.

Upon arriving at that apartment, Baxter and Appellant were invited inside; Baxter went in first. Appellant conceded that, upon entering the apartment, he observed Baxter holding a knife and placing an arm around the neck of one of the women. Despite this precarious circumstance, Appellant contended the other female then asked him for sex, but he declined because he would not cheat on his girlfriend. Thereafter, one of the women mentioned the recent death of the brother of Appellant and Baxter, and that his death was deserved because it occurred during a failed robbery attempt. Baxter responded by punching her. Nonetheless, that female later started kissing Appellant and they engaged in consensual sexual intercourse on the floor. Thereafter, Appellant and Baxter switched partners and again engaged in sexual intercourse with the women.

The next morning, one of the women asked Baxter for the promised crack. When Baxter admitted to her that he did not have any, she ran outside, yelling "rape." The next day, Appellant was arrested.

Prior to Appellant's bond hearing, Marsh Curtice, an on-again-off-again boyfriend of Victim 1, left Victim 1 a voicemail:

[Victim 1], you have no right to call the law on me for something I haven't done. I didn't touch your car—didn't touch you—some [inaudible] got spilled [inaudible]. But you have no right to make up this sh[* *] to try to get me in trouble. So in recourse, I go back and tell the police what you told me the last three weeks about your case—and I mean that's the word on the street anyway—that you guys invited them in to smoke crack, smoke crack, trade sex all night and then got mad at y'all selves in the morning. So if something comes from this, I will contact the defense attorneys, and the solicitor, and public defender offices, and tell my story. And that will put a lot of doubt in a lot of people's minds. You know, and that's going by what you told me. I'll tell the truth. You're making up sh[* *]. I didn't touch you; I didn't touch your car. So if you're gonna cause me trouble for something I didn't do, I'm gonna cause you trouble for something you did do.

Despite the fact that the voicemail explicitly referred to potentially exculpatory statements that Curtice claimed "[Victim 1] told [him] the last three weeks about [the] case,"

Curtice would later explain to law enforcement that, "Whatever I said in that voicemail wasn't based on any facts whatsoever. There was a spat between [Victim 1] and I. The voicemail was completely made up. There's no basis of facts in the voicemail whatsoever." Curtice even insisted he "never discussed [with Victim 1] what happened" and that he was previously unaware of the fact that Appellant and Baxter's account of the incident involved the exchange of sex for drugs, a version of events closely paralleling the substance of Curtice's voicemail. Thus, according to Curtice, any similarity between his "fabricat[ed]" voicemail and Appellant's version of the incident was simply a "lucky guess." Curtice also provided a statement explaining his prior alleged fabrication.

A few months later, in January and February of 2011, a York County grand jury indicted Appellant and Baxter for their alleged criminal acts toward the Victims. Appellant was charged with one count of first degree burglary, two counts of first degree criminal sexual conduct, two counts of kidnapping, two counts of first degree assault and battery, and four counts of possession of a knife during the commission of a violent crime.

Prior to trial, the State sought to prosecute Appellant and Baxter separately. In response, Baxter's attorney, with the consent of Appellant, filed a motion for joinder. The trial court held a hearing on the matter; Baxter's attorney argued the cases should be tried together in light of judicial economy, and that prejudice would result if the two cases were tried separately. More specifically, Baxter's attorney referenced the factual complexity of the matter, the sheer number of witnesses, that "all the players are exactly the same, [and] all the testimony [that] will be relevant to one [case] would be relevant to the other," and that if the cases were tried separately, the brother tried second may be subject to cross examination twice and, in anticipation of this potential disadvantage, choose not to testify at the earlier trial, despite the fact that he could be a key witness. While Baxter's attorney recognized the Solicitor's "right to control the docket," he maintained that there are "many occasions where that [right] has to be curtailed." Appellant's attorney concurred, stating "it's to [Appellant's] advantage to have a joint trial."

The trial judge denied the motion for joinder, citing the Solicitor's ability to call cases so as to "facilitate the efficient

administration of h[er] official duties." The trial judge opined that even if trial courts have a discretionary and supervisory role in this regard, he would "exercise that discretion and not allow the joining."

Additionally, at this pre-trial hearing, the trial court heard a proffer of Curtice's testimony to determine whether the Solicitor should be disqualified because she personally took Curtice's statement. Because the purpose of this proffer was limited to determining whether the Solicitor was disqualified, the trial judge did not address the admissibility of Curtice's testimony; the voicemail, however, was published to the court. After Curtice finished testifying, the Solicitor testified about the circumstances surrounding the taking of Curtice's statement.[2] The trial court subsequently declined to excuse the Solicitor and, in turn, a jury was struck and Appellant's trial commenced.

After numerous witnesses testified, Appellant sought to call Curtice as a witness. Appellant argued that the case was based upon credibility, *i.e.*, the Victims' story was completely at odds with Appellant's version of events and that Curtice's testimony also demonstrated Victim 1 made inconsistent statements and, thus, Victim 1 was not a truthful witness. Specifically, defense counsel referenced the fact that Victim 1 denied talking to Curtice about what happened, and that it would be inconceivable that somebody who did not talk to Victim 1 could "make a guess out of thin air and leave a voicemail" that directly comported with Appellant's account. The State objected on *relevancy* grounds, arguing Curtice would "simply interject into the proceeding something that he denies hearing from the victim." The State further contended that if Curtice's testimony showed anything, it would be that Curtice lied. Thus, according to the State, Curtice could not testify about what he had previously said Victim 1 told him because he more recently claimed that he had not heard anything about the case from Victim 1. The trial court, agreeing with the State, then stated:

> [W]e don't [try] people ... on what some people, counsel or anybody else, have a hard time believing. We['ve] got to

---

2. Notably, the Solicitor conceded the contents of the voicemail, if true, would be exculpatory.

stick to the rules. So I find that there is no relevancy, not a scintilla of relevancy in Mr. Curtice's testimony and I therefore sustain the objection and [will] not allow him to testify.

After the jury heard the remaining testimony and closing arguments, the jury convicted Appellant of kidnapping, second degree criminal sexual conduct, second degree assault and battery, and possession of a knife during the commission of a violent crime. The trial court sentenced Appellant to thirty years of incarceration.

## ISSUES ON APPEAL

1. Did the trial court err by denying joinder?

2. Did the trial court err by finding Curtice's testimony was not relevant and, as a result, denying Appellant's request to call Curtice as a witness?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only and is bound by the factual findings of the trial court unless clearly erroneous. *State v. Halcomb*, 382 S.C. 432, 438–39, 676 S.E.2d 149, 152 (Ct.App.2009). Thus, the role of the appellate court is limited to determining whether the trial court abused its discretion. *Id.* at 438, 676 S.E.2d at 152. "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *State v. Lyles*, 379 S.C. 328, 334, 665 S.E.2d 201, 204 (Ct.App.2008).

### I. Joinder

The essence of Appellant's first contention is the trial court abused its discretion in denying joinder of Appellant's trial with that of Baxter because (1) a just and proper consideration of the particular circumstances required a joint trial, and (2) the trial court's reliance upon the Solicitor's control of the docket was, in light of *State v. Langford*,[3] erroneous as a matter of law.

---

3. 400 S.C. 421, 436, 735 S.E.2d 471, 479 (2012) (holding a statute vesting the solicitor with exclusive authority to determine the "order" in which cases are called unconstitutional).

## A. Preservation

■ At the pre-trial hearing, the Solicitor requested the trial court to first take up the motion for joinder; Baxter's attorney filed this motion and served it upon Appellant and the Solicitor. The trial judge requested Baxter's attorney to hand up a copy and, upon receiving it, stated, "This says it[']s kind of a joint motion, but I understand it's really a motion on behalf of Mr. Baxter with consent of [Appellant]." Appellant's counsel responded, "That's correct, Your Honor." After Baxter's counsel further argued in support of the motion, the trial judge asked Appellant's counsel if he had anything further to add; Appellant's attorney concurred with Baxter's attorney, stating it was "to [Appellant's] advantage to have a joint trial."

The State argues this issue is not preserved for appeal because an "appellant may not use the objection of another defendant to gain review." *See State v. Nichols,* 325 S.C. 111, 123, 481 S.E.2d 118, 124 (1997); *accord State v. Carriker,* 269 S.C. 553, 555, 238 S.E.2d 678, 678 (1977). While *Nichols* and *Carriker* do stand for the stated proposition, and the motion at issue was filed on Baxter's behalf, albeit with the consent of Appellant, *Nichols* and *Carriker* are not directly on point. In *Carriker,* the appellant did not object at trial to the matter he later appealed. 269 S.C. at 555, 238 S.E.2d at 678. Similarly, in *Nichols,* an issue was not preserved for appeal because the appellant failed to object during trial or join in his co-defendant's objections. 325 S.C. at 123, 481 S.E.2d at 124. Here, although the trial judge determined, and Appellant agreed, that the motion was filed on behalf of Baxter *with Appellant's consent,* the trial judge also noted that the motion itself indicated it was a "joint motion." Furthermore, the trial judge understood the motion involved Appellant; the trial judge directly asked Appellant's counsel if he would like to add anything to what Baxter's counsel had already argued in support of the motion, to which Appellant's counsel responded, "it's to [Appellant's] advantage to have a joint trial." In recognition of these facts, Appellant sufficiently raised the issue at trial and preserved the issue for review.

## B. Merits

Because the issue is preserved for review, we now consider whether the trial judge abused his discretion in denying

joinder because (1) the particular circumstances of the case required a joint trial, and (2) the trial court's reliance upon the Solicitor's control of the docket was, in light of *Langford,* erroneous as a matter of law.

1.  The Particular Circumstances of the Case Did Not Require a Joint Trial.

Although the solicitor no longer has exclusive authority to determine the order in which cases are called, the solicitor retains "discretion in choosing how to proceed with a case." *Compare Langford,* 400 S.C. at 436, 735 S.E.2d at 479 (holding a statute vesting the solicitor with exclusive authority to determine the "order" of cases is unconstitutional) *with, id.* at 435 n. 6, 735 S.E.2d at 479 n. 6 (stating the solicitor's discretion in choosing how to "proceed" with a case, including how to prosecute it, remains unaffected by this case). Further, this prosecutorial discretion to decide "how to prosecute a case" remains subject to the broad supervision of the trial judge. *Langford,* 400 S.C. at 448, 735 S.E.2d at 485. Accordingly, even where a solicitor determines that a joint trial or, alternatively, separate trials of criminal co-defendants would best facilitate the efficient administration of her prosecutorial duties, a trial court may still, in its sound discretion, grant severance or order joinder, respectively, to protect a defendant's right to a fair trial. *See Halcomb,* 382 S.C. at 439, 676 S.E.2d at 152–53 (stating a decision on whether to grant or deny a *motion for severance* is subject to a trial court's sound discretion). Thus, a trial court's decision to grant or deny a motion opposing the solicitor's election of either joint or separate trials will not be disturbed on appeal absent an abuse of the trial court's discretion. *Cf. id.* at 439, 676 S.E.2d at 153 (stating a trial court's decision to deny a motion for severance will not be disturbed absent an abuse of discretion). Further, when the trial judge bases this determination "upon a just and proper consideration of the particular circumstances which are presented to the court in each case," an abuse of discretion does not result. *Id.* at 440, 676 S.E.2d at 153.

In the instant matter, the Solicitor argued separate trials would best facilitate the efficient administration of prosecutorial duties because: (1) it would allow the State to best present each case; (2) additional, very incriminating evidence

could come into play against Baxter, but which would be inadmissible against Appellant; and (3) *Bruton*[4] issues existed. Baxter's attorney argued joinder was appropriate in the interest of judicial economy and, most importantly, to reduce prejudice. He cited the factual complexity of the matter and the number of witnesses, and argued: (1) "all the players are exactly the same;" (2) the testimony relevant to one case would also be relevant to the other; (3) if the cases were tried separately, one brother, *i.e.*, a key witness, may not testify at the earlier trial in an attempt to avoid two cross-examinations;[5] and (4) *Bruton* concessions were possible.

■ The trial judge determined that while the authority of a solicitor to "facilitate the efficient administration of [the office's] duties" is subject to the trial court's supervision, Appellant did not present sufficient "legal cause to grant" joinder and to "[a]ffect the facility and the strategy . . . of the solicitor." Because the trial judge based his decision to deny joinder upon a just and proper consideration of the issues at hand, the trial judge did not abuse his discretion in denying joinder. *See Halcomb*, 382 S.C. at 440, 676 S.E.2d at 153 (stating an abuse of discretion does not occur when the trial judge bases his determination upon a just and proper consideration of a case's circumstances).

2. The Trial Court Did Not Err In Considering the Solicitor's Authority To Determine the *Manner In Which the Solicitor Proceeds* With a Case's Prosecution.

■ Appellant also argues that the trial court's reliance upon the solicitor's control of the docket was, in retrospect, erroneous as a matter of law due to the *subsequent* decision by our supreme court in *Langford*.[6] We disagree. First, the trial court did not specifically rely upon the solicitor's then-existing ability to control the *order* of how cases are called in denying joinder. Rather, the trial court explicitly referenced

---

4. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

5. Baxter did not testify at Appellant's trial.

6. *Langford* was decided in November 2012, ten months after Appellant's trial.

the solicitor's right to "call cases in such a *manner*" as to "facilitate the efficient administration of h[er] official duties." Notably, prior to *Langford*, the "solicitor ha[d] the authority to call cases in such *order* **and** in such *manner* as will facilitate the efficient administration of [the solicitor's] official duties." *State v. Mikell*, 257 S.C. 315, 322, 185 S.E.2d 814, 816–17 (1971) (recognizing the solicitor's authority to determine both the *order* and the *manner* in which cases are called) (emphases added). While a solicitor can no longer determine the "order" in which cases are called, *Langford* makes clear that a solicitor's authority to determine how a solicitor "proceed[s]" with any particular case, *i.e.*, the manner, remains permissible. *See Langford*, 400 S.C. at 435 n. 6, 735 S.E.2d at 479 n. 6 (stating, "[u]ndoubtedly, the solicitor has discretion in choosing how to proceed with a case," and such decisions "are prerogatives of the solicitor ... and are unaffected by our decision"). Thus, the trial court did not err in considering the solicitor's authority to determine the *manner* in which the solicitor proceeds with a case's prosecution. *Halcomb*, 382 S.C. at 439, 676 S.E.2d at 153.

## II.  The Right to Offer Relevant Witness Testimony

Appellant next argues the trial court erred in finding Curtice's testimony would not be relevant and, as result, by denying Appellant the right to call this witness in his case-in-chief. Appellant sought to introduce this testimony to further his theory of the case, *i.e.*, that the sexual encounter was consensual, that the Victims' allegations were in retaliation for Appellant and Baxter not providing drugs in exchange for sex, and that Victim 1's testimony was not credible because it conflicted with what Victim 1 previously told Curtice.

"The right to offer the testimony of witnesses ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). This Sixth Amendment right "guarantee[s] that a criminal charge may be answered through the calling and interrogation of favorable witnesses...." *State v. Schmidt*, 288 S.C. 301, 303, 342 S.E.2d 401, 402 (1986). Accordingly, a defendant has a fundamental constitutional right

to offer *relevant* witness testimony. *Washington,* 388 U.S. at 23, 87 S.Ct. 1920.

■■ " 'Relevant evidence' means evidence having *any tendency to make the existence of any fact* that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." Rule 401, SCRE (emphases added); *accord Lyles,* 379 S.C. at 337, 665 S.E.2d at 206. Thus, any "[e]vidence which assists a jury at arriving at the truth of an issue is relevant." *See Lyles,* 379 S.C. at 337, 665 S.E.2d at 206 (quoting *Schmidt,* 288 S.C. at 303, 342 S.E.2d at 403 (internal quotations omitted)).

■■ The trial judge's decision regarding such a relevancy determination should not be overturned, absent an abuse of discretion. *State v. Aleksey,* 343 S.C. 20, 35, 538 S.E.2d 248, 256 (2000). An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support. *Lyles,* 379 S.C. at 334, 665 S.E.2d at 204. Additionally, an "error without prejudice does not warrant reversal." *State v. King,* 367 S.C. 131, 136, 623 S.E.2d 865, 867 (Ct.App. 2005); *accord State v. Wise,* 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) (finding an abuse of discretion relating to the admission of evidence is not reversible absent accompanying probable prejudice); *Lyles,* 379 S.C. at 334, 665 S.E.2d at 204.

In light of the aforementioned authorities, we hold the trial judge abused his discretion in finding Curtice's proffered testimony was not relevant and, as a result of this finding, Appellant was prejudiced.

In the weeks following the alleged assaults, Marshall Curtice left several voicemail messages for Victim 1. In every message, Curtice adamantly maintained that he did not damage the car of Victim 1; apparently, Victim 1 was of the belief that Curtice damaged it, and she had been threatening to call the police if Curtice did not remedy the matter. The eighth voicemail is particularly salient to the instant matter:

[Victim 1], you have no right to call the law on me for something I haven't done. I didn't touch your car—didn't touch you—some [inaudible] got spilled [inaudible]. But you have no right to make up this sh[* *] to try to get me in trouble. So in recourse, I go back and tell the police *what*

*you told me the last three weeks about your case*—and I mean that's the word on the street anyway—*that you guys invited them in to smoke crack, smoke crack, trade sex all night and then got mad at y'all selves in the morning.* So if something comes from this, I will contact the defense attorneys, and the solicitor, and public defender offices, and tell my story. And that will put a lot of doubt in a lot of people's minds. You know, *and that's going by what you told me.* I'll tell the truth. You're making up sh[* *]. I didn't touch you; I didn't touch your car. So if you're gonna cause me trouble for something I didn't do, I'm gonna cause you trouble for something you did do.

(emphases added).

Although Curtice later recanted this message, claiming that he was engaged in an argument with Victim 1 at the time he left the message, that the message was made in "spite," that the message was a "complete fabrication" he pulled out of the air, and that any similarity the message bore to Appellant's version of events was merely a "lucky guess," Appellant sought to call Curtice as a witness to testify about what Curtice claimed Victim 1 disclosed to him in the weeks following the incident. Notably, Victim 1 testified that she did not talk to Curtice about the alleged assaults. Despite Appellant's contentions that Curtice's testimony would directly support Appellant's account that the allegations of the Victims were in retaliation for not providing drugs in exchange for consensual sex, and would serve to diminish the credibility of Victim 1, the trial judge found there was "not a scintilla of relevancy in Mr. Curtice's testimony," and did not allow Curtice to testify. By not allowing Appellant to call Curtice as a witness, the trial court erred.

First, based upon the proffer, Curtice's testimony was relevant to whether Appellant's encounter with Victim 1 and Victim 2 involved consensual sex, a contention consistently maintained by Appellant and directly supported by Curtice's voicemail message. Although Curtice ultimately testified that the voicemail was a pure fabrication and that his subsequent statement was truthful, such inconsistent positions do not render his testimony without relevance. Testimony about whether Victim 1 told Curtice she engaged in sexual acts in exchange for drugs would certainly assist the jury in arriving

at the truth of the issue because, if the jury determined Curtice was telling the truth in his voicemail, which was a determination exclusively within the jury's province, then Curtice's testimony undoubtedly would have tended to make a determination that Appellant engaged in consensual sex with the Victims more probable. *See Lyles,* 379 S.C. at 337, 665 S.E.2d at 206 (stating evidence which assists a jury at arriving at the truth of an issue is relevant); Rule 401 SCRE, (" 'Relevant evidence' means evidence having *any tendency to make the existence of any fact* that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." (emphases added)); *see also State v. McKerley,* 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct.App.2012) ("The assessment of witness credibility is within the *exclusive province* of the jury." (emphasis added)). Thus, based upon the proffer, the evidence was relevant and the trial judge erred by not allowing Appellant to call Curtice as a witness.

Second, based upon the proffer, Curtice's testimony was also relevant to the credibility of Victim 1, because the testimony of Victim 1 conflicts with what she allegedly told Curtice. Victim 1 specifically testified that she "never really talked" to Curtice or "told him any details" about the alleged assaults. Victim 1 also answered, "Yes," when asked if it was correct to presume that any knowledge Curtice had about what happened must have arisen from what somebody else told him. Additionally, Victim 1 testified that she did not have sex with the men in exchange for drugs and that she did not allege rape in response to the men reneging on a promise to provide drugs in exchange for sex. In contrast to these claims, Curtice stated in the voicemail that he had knowledge of the incident due to "what [Victim 1] told him the last three weeks about [her] case," *i.e.,* that the Victims invited Appellant and Baxter in to "smoke crack, trade sex all night" and that the Victims claimed rape when they "got mad at [them-]selves in the morning." Accordingly, Curtice's testimony would have assisted the jury in determining the credibility of Victim 1. *See Lyles,* 379 S.C. at 337, 665 S.E.2d at 206 (stating evidence which assists a jury at arriving at the truth of an issue is relevant); Rule 401, SCRE (" 'Relevant evidence' means evidence having *any tendency to make the existence of*

*any fact* that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." (emphases added)).

Furthermore, we note that the trial court likely conflated relevancy with either credibility or admissibility pursuant to other evidentiary rules. Specifically, it appears the trial court deduced Curtice's proffered testimony necessarily lacked relevance because Curtice recanted his statements made within the voicemail message and claimed the voicemail was a complete fabrication and, therefore, Curtice purportedly had no personal knowledge of the incident. Accordingly, the trial judge essentially determined that Curtice's later claim (statement and testimony) was truthful and that his earlier, contradictory statements in the voicemail message were untruthful. Thus, the trial judge ostensibly made a credibility determination, which was within the exclusive province of the jury, and, consequently, impermissibly precluded the jury from considering evidence that would have "assist[ed] [the] *jury* at arriving at the truth." *See Lyles,* 379 S.C. at 337, 665 S.E.2d at 206 ("Evidence which assists a jury at arriving at the truth of an issue is relevant." (citation and quotation marks omitted)); *McKerley,* 397 S.C. at 464, 725 S.E.2d at 141 ("The assessment of witness credibility is within the *exclusive province* of the jury." (emphasis added)). Moreover, the existence of conflicting statements by a witness does not mean he is an incompetent witness or that his related testimony would lack relevance; rather, such a circumstance expressly creates a question for the jury. *See King,* 367 S.C. at 137, 623 S.E.2d at 868 ("Courts presume a witness to be competent because bias or other defects in a witness's testimony-revealed primarily through cross-examination-affect a witness's credibility and may be weighed by the finder of fact."). It is for such reasons that considerable latitude is allowed in the cross-examination of a witness to test the accuracy of his memory, his bias, prejudice, interest, or credibility; "a witness may be asked questions ... *in reference to prior statements contradictory of [his] testimony,* or in reference to statements concerning relevant matter not contradictory of testimony." *State v. Jenkins,* 322 S.C. 360, 364, 474 S.E.2d 812, 814 (Ct.App.1996) (emphasis added). Because inconsistency of a witness's prior statements does not implicate relevancy, the

trial court erred in finding the proffer of Curtice's testimony was not relevant and, as a result, not allowing Appellant to call Curtice as a witness, even though the credibility of Curtice's testimony could have been called into question.[7]

In light of our finding that Curtice's testimony was relevant, the trial court's error in not allowing Appellant to call Curtice to present relevant witness testimony to the jury is coupled with prejudice as a matter of law. *See King,* 367 S.C. at 140, 623 S.E.2d at 870 (holding, where the trial court abused its discretion in not allowing a witness to testify, the error was "coupled with prejudice as a matter of law"); *see Washington,* 388 U.S. at 23, 87 S.Ct. 1920 (holding a defendant has a fundamental constitutional right to offer *relevant* witness testimony); *see also id.* ("The right to offer the testimony of witnesses ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."). Accordingly, we reverse and remand for a new trial. *See State v. Brown,* 360 S.C. 581, 591, 602 S.E.2d 392, 398 (2004) (distinguishing "between a reversal based on insufficient evidence and one based on errors in the trial proceedings"); *id.* (finding the Double Jeopardy Clause does not preclude retrial when a conviction is set aside because of an error in the trial proceedings).

## CONCLUSION

For the foregoing reasons, we **REVERSE** and **REMAND** for a new trial.

HUFF and LOCKEMY, JJ., concur.

---

7. We acknowledge that subsequent rulings may have been necessary to determine whether any specific testimony elicited at trial would have been admissible pursuant to the South Carolina Rules of Evidence and applicable caselaw.